UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK JAMES FARMER, | No. 2: 13-cv-0996 MCE KJN P |
| Petitioner, | |
| v. | FINDINGS & RECOMMENDATIONS |
| HEIDI M. LACKNER, | |
| Respondent. | |

Introduction

    Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2011 conviction for making criminal threats (Cal. Penal Code § 422), corporal injury to a spouse with a prior conviction (Cal. Penal Code §§ 273.5(a), 273.5(e)), spousal rape (Cal. Penal Code § 262(a)(1)) and false imprisonment (Cal. Penal Code § 236/237(a)). Petitioner is serving a sentence of 11 years and 4 months imprisonment.[1]

    This action is proceeding on the original petition. Petitioner raises four claims: 1) the trial court erred in admitting "profile" testimony; 2) the trial court erred in excluding evidence of

---

[1] In addition to the charges of which he was convicted, petitioner was also charged with assault with a deadly weapon, a knife, with force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)). The jury could not agree on this charge.

the victim's prior felony welfare fraud conviction; 3) insufficient evidence to support his conviction for spousal rape; and 4) insufficient evidence to support his conviction for false imprisonment.

After carefully reviewing the record, the undersigned recommends that the petition be denied.

<u>Standards for a Petition for Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

2

clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Id., at 1097.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's

decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

Factual and Procedural Background

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> Defendant and the victim married in 2006. It was a tempestuous marriage, which involved violence and multiple separations. In June 2008, defendant entered a guilty plea to misdemeanor domestic battery of the victim.
>
> Three weeks into their latest separation in February 2010, the victim began texting defendant on her daughter's cell phone. She had belongings and a dog at defendant's residence; she also testified that she was missing him and giving thought to living with him again.
>
> On February 23, 2010, the victim both texted defendant and spoke with him on the phone. She told him that she wanted to come home and retrieve some of her belongings and her dog, and to talk with him, but she did not want to stay.
>
> The victim had been staying overnight at the house of a childhood friend. The friend's younger sister gave the victim a ride to the motorhome that the victim and defendant had shared on his father's property. They stopped off at homes of two other people en route, the victim leaving her purse and phone behind at some point in order to prevent defendant from seizing them.
>
> The younger sister thought the victim seemed apprehensive. Although it was a cold and rainy night, the victim had planned on walking back with her dog and belongings, and did not ask the younger sister to stay (the latter having school in the morning).
>
> When defendant answered the door, he already appeared to be angry. He grabbed both sides of her head and threw her on the bed, pressing down on her neck with his hands. He called her a bitch and complained about her humiliation of him. At some point he stopped strangling her; while he had her pinned down with his leg, he told her that he would kill her. She saw defendant grab a knife from the sofa; he said he should cut her throat. The victim feared for her life. Defendant repeatedly hit her head, complaining about the victim spending Valentine's Day with her teen daughter's friend; he intimated some sort of sexual liaison, which the victim told him was not true.

////

> Defendant stopped his physical assaults. He began to talk with the victim about how she "wasn't being right as a wife," asserting that she "belong [ed] to him" as her husband and she was "humiliating him in front of his family." He told her that he would not let her leave him again: "[H]e would blow his head off and blow [hers] off and [they]'d both live in hell." She was attempting to calm him down. After about a half-hour, they "ended up having sex together." Telling her that he knew she had left him because he was insufficiently attentive to her sexual needs, defendant pulled down her pants and began to have oral sex with her. This disgusted her, but she lay there and let it happen because she did not want to trigger any further physical abuse. Defendant then had intercourse with her. Sensing her tenseness, he told her she did not need to be afraid. Again, she did not resist these further intimacies because she was indeed afraid she would "start getting hit again."
>
> The victim spent a sleepless night with defendant at her side. In the morning, defendant told her he needed to get some cigarettes. He warned her not to forget what he had told her, or try to leave because he would find her wherever she went and shoot her regardless of who was present. She lay there afraid to move until she heard him drive off down the hill (which was after he had walked to his father's house to ask for a ride). She then fled the motorhome and knocked on doors. The second home let her in to use the phone. She told them that her husband had been holding her against her will until she took this opportunity to escape. She called a close friend, who then called the sheriff. While she waited in the home, she and the homeowners could see defendant outside walking up and down the road in an apparent search for her.
>
> When a sheriff's deputy arrived, she showed him her injuries and described defendant's threats and physical attacks. She did not say anything about the sex acts in her initial report to the deputy about the incident because it was "embarrassing," and did not think it was a crime; she also thought the deputy "would not believe it anyway." She changed her mind after hearing that defendant had been claiming an all-night sexual encounter with her, and later told a prosecution investigator about the rape while reviewing her previous statement.
>
> After retrieving the cell phone she had left in her purse, the victim found that defendant had left four voice mails after her last conversation with him and before her arrival that night. They were threatening in nature. Had she heard them, she never would have gone to the motorhome.
>
> The prosecutor questioned the victim about her status as a welfare recipient and the fact that she received cash income for cleaning houses that she gave to defendant and never reported. She asserted that she was not afraid of prosecution for welfare fraud for this incidental income, and denied any concern that defendant might have reported her. However, she had received immunity from prosecution for any testimony related to this issue.

1  (Respondents' Lodged Document 4 at 2-6.)

2  Claim One

3  *State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. The California Court of Appeal denied this claim for the reasons stated herein:

> I. Admission of Testimony Regarding the "Power and Control" Wheel
>
> Although it is difficult to pin down the exact contours of his argument, defendant generally contends it was error to allow a prosecution investigator to testify regarding the existence of categories of methods of abuse as summarized in a "Power and Control" wheel, and then to answer hypothetical questions as to whether conduct reflected in the facts in the present case came within these categories. We first relate the facts relevant to this argument, which we have not included in our summary above.
>
> A. Background
>
> A prosecution investigator attested to his experience with domestic violence in his present role and in his former position as a peace officer, an issue on which he had focused in his career. This included contacts with "hundreds if not thousands" of victims of domestic violence and investigations in more than 140 cases of domestic violence while working in the prosecutor's office. He had participated in various victim-oriented training opportunities. He had testified previously as an expert on the topic of the "[d]omestic violence power and control ... wheel" and other issues arising in prosecutions for domestic violence.
>
> After questioning the investigator about his interviews with the victim, the prosecutor asked about the "Power and Control" wheel. The investigator described it as a summary of conduct present in cases of domestic violence, collected from victims in 1990 and 1991 in the course of "a domestic violence community effort" (making clear later in his testimony that this was a product of a joint effort between law enforcement and victims' representatives).
>
> Before allowing the investigator to proceed with this testimony, defense counsel objected that there was not any evidence that this summary (appearing in a visual aid that the investigator/witness had brought) had ever been subjected to any validation. The trial court ruled that it was admissible as a visual aid to the investigator's testimony on the subject. The prosecutor noted that she was not seeking to broach the subject of battered-partner syndrome, but to discuss "ways that power is kept in [a] domestic violence

6

relationship" in order for the jury to understand "why [the victim is] acting certain ways and saying certain things," in the course of which she would be asking hypothetical questions. The prosecutor specifically mentioned the need to explain why a person would stay in a relationship with an abuser and return to that person, or fail to protest having intercourse against her will.

The investigator testified generally that the eight spokes of the wheel in the picture represented different techniques by which an abuser gains control of a victim of domestic violence, and briefly summarized each of them. The prosecutor then asked hypothetically about the effect when an abuser "would not allow [a victim] to have any of [her] own money," "call[ed] [her] ... mean words," made "mean looks and gestures," used "jealousy to justify [his] actions," and asked "[the] victim to lie about the abuse that had happened." In each instance, the investigator expressed his opinion that these actions were in accord with the wheel's summary of common methods for gaining control over a victim. The investigator noted on cross-examination that the wheel represented a summary of past cases and did not purport to be a diagnostic tool for use in a criminal prosecution to determine whether domestic violence had occurred.

B. Analysis

After a lengthy summary of these facts, defendant asserts the wheel did not purport to dispel any common misperceptions about victims of domestic violence, as does properly introduced evidence of rape trauma syndrome (see People v. Bledsoe (1984) 36 Cal.3d 236, 247–248; cf. People v. Sandoval (2008) 164 Cal.App.4th 994, 1000, 1002 [ostensible "make-up sex" phenomenon does not dispel common misperceptions] ), nor was it to rehabilitate an inconsistent domestic violence victim (e.g., People v. Brown (2004) 33 Cal.4th 892, 895–896, 907). Defendant contends it was instead only inadmissible profile evidence—which invites a jury to find a defendant guilty if he satisfied equivocal criteria attributed to criminal behavior. (People v. Robbie (2001) 92 Cal.App.4th 1075, 1085–1087; see People v. Smith (2005) 35 Cal.4th 334, 357–358.) Defendant thus argues that "[w]ith hypothetical questions and answers based squarely on the evidence [at trial], the jury was led to conclude that [he] was a chronic spousal abuser," which he asserts supported the victim's veracity and negated any claim of his reasonable and subjective belief in the consensual nature of the act of intercourse. He also suggests in passing that if indeed a jury needed expert testimony on the methods in which an abuser gains control over a victim, then the investigator was not a qualified expert.

We tackle the latter point first. The cursory manner in which defendant has raised this argument, without any effort to establish that the trial court's decision to qualify the witness was unreasonable on the facts before it, forfeits our plenary consideration of it. (Imagistics Internat., Inc. v. Department of General Services (2007) 150 Cal.App.4th 581, 592, fn. 8, 593.) We therefore confine ourselves to noting that the investigator had

7

> sufficient experience with victims of domestic violence for the trial court reasonably to conclude he had expertise in common attributes of abuse in such cases that resulted in surrender of control to the abuser.
>
> As for the testimony itself, it did not amount to improper profile testimony. The witness did not specifically tie the methodology of abusers to defendant, nor assert at any point that a defendant would be guilty of the charged offenses of criminal threats, corporal injury, spousal rape, or false imprisonment if he engaged in these behaviors. (People v. Prince (2007) 40 Cal.4th 1179, 1226.) His responses to the five hypothetical questions also did not amount to an opinion on defendant's guilt of the charged offenses, or whom to believe, or invite a conclusion as to any element of the charged offenses (including consent). (Id. at pp. 1226–1227.) They only provided an explanation for why a victim might return to an abuser or fail to protest an unwanted act of intercourse. Finally, we cannot discern any possibility of prejudice to defendant. Testimony regarding the types of abusive behavior leading to the exercise of control over a victim was brief, and the five hypothetical questions were general rather than connected directly with defendant. The investigator witness abjured any connection between the wheel and the truth-finding function of a trial. The prosecutor did not even reference this testimony in closing argument. Most importantly, despite the victim's undisputed testimony regarding defendant's employment of a knife, there were jurors willing to acquit him of assault with a deadly weapon and use of a deadly weapon, indicating the witness did not ineluctably draw the jury as a whole to a conclusion that defendant was guilty as charged. Accordingly, we reject this argument.

(Id. at 6-10.)

*Analysis*

As noted by the California Court of Appeal, petitioner makes two arguments regarding the admission of the expert testimony regarding the power and control wheel.  First, petitioner argues that the district attorney investigator did not qualify as an expert witness.  Petitioner raised this claim, although cursorily, in the petition for review filed in the California Supreme Court.  (Respondent's Lodged Document 6 at 5.)  Second, petitioner argues that the district attorney investigator's testimony was not relevant and improper profile testimony.

In the answer, respondent does not address petitioner's argument that the district attorney investigator did not qualify as an expert witness.  Respondent does not argue that this claim is procedurally barred based on the California Court of Appeal's finding that the claim was waived based on inadequate briefing.  Accordingly, the undersigned will consider the merits of this claim.

1    See Vang v. Nevada, 329 F.3d 1069, 1073 (9th Cir. 2003) (generally, the state must assert the
2    procedural default as an affirmative defense to the petition before the district court; otherwise the
3    defense is waived).
4         The Supreme Court has not ruled on the issue of appropriate qualifications of expert
5    witnesses and the limits of their testimony as a matter of constitutional law. Instead, the Supreme
6    Court's rulings on these issues involve interpretations of the Federal Rules of Evidence. See
7    Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999); Daubert v. Merrell Dow Pharms.,
8    Inc., 509 U.S. 579, 587–88 (1993). The absence of any clearly established constitutional law on
9    this issue forecloses this claim. See Wright v.Van Patten, 552 U.S. 120, 125–26 (2008).
10        Turning to petitioner's second claim challenging the expert's testimony, the admission of
11   evidence is not subject to federal habeas review unless a specific constitutional guarantee is
12   violated or the error is of such magnitude that the result is a denial of a fundamentally fair trial
13   guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Only if
14   there are no permissible inferences that the jury may draw from the evidence may its admission
15   violate due process. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Moreover,
16   the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly
17   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."
18   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission
19   of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent
20   but not contrary to, or an unreasonable application of, clearly established Federal law under §
21   2254(d)).
22        The prosecutor told the court that she wanted to offer District Attorney Investigator
23   Wallace's testimony regarding the control and power wheel in order to describe the ways that
24   power is kept in a domestic violence relationship. (RT at 244.) The prosecutor stated that she
25   would not have Wallace offer any ultimate conclusions as to the victim of the case. (Id.) Rather,
26   Wallace's testimony would help the jury to understand why the victim acted certain ways and
27   said certain things, i.e., so the jury understood the relationship between the victim and petitioner.
28   (Id.)

District Attorney Investigator Wallace testified that the power and control wheel is a graph that was developed to examine what kind of traits or actions are present in domestic violence cases. (Id. at 238.) "[I]t indicates power and control in the center of the wheel or hub of the wheel is what is desired by the offender. The spokes of the wheel or the pie sections are methods and procedures … that the offender will use to control or try and control their victim approximate (sic)." (Id. at 254.) Physical and sexual violence at the outer rim of the wheel is what is used to tie it all together and hold it in when the power and control issues fail to exert the desired power and control. (Id.)

Investigator Wallace then went on to describe the spokes of the wheel. The undersigned describes some of this testimony herein. Regarding the "coercion and threat" spoke, he testified that if someone is afraid for their physical safety they may stay or they may submit. (Id. at 255.) He also testified that if someone was afraid that they would be reported for criminal activity, that would make a victim feel afraid to come forward. (Id.) Wallace testified that emotional abuse could be used to make a victim think they would not be believed. (Id.) Wallace testified that abusers minimize the violence and blame the victim so that the victim believes it is their fault and that they were not badly hurt. (Id. at 256.) He also testified that it was common for abusers to use children against the victim by threatening that if they reported the abuse, they would not see their children again. (Id.) He testified that abusers use the "male privilege," which is treating the victim like a servant. (Id.) Abusers also use economic abuse in that they control the money so that the victim is economically dependent on the abuser. (Id. at 256-57.)

For the reasons stated by the California Court of Appeal, the undersigned finds that the admission of Wallace's testimony did not violate fundamental fairness. Wallace's testimony provided an explanation for why a victim might stay in an abusive relationship and fail to report it. Wallace did not specifically tie his testimony to petitioner nor testify as to petitioner's guilt. Therefore, testimony was relevant in that it offered an explanation for the victim's behavior, assuming the jury believed the victim.

As for petitioner's argument that the testimony was improper propensity evidence, there is no clearly established Supreme Court authority holding that the admission of propensity evidence

violates due process. See Moses v. Payne, 555 F.3d 742, 761–62 (9th Cir. 2009) (rejecting a habeas claim because the Supreme Court has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause); Alberni v. McDaniel, 458 F.3d 860, 863–67 (9th Cir. 2006) (stating that the Supreme Court has not yet ruled on the specific question of whether the admission of propensity evidence violates the Due Process Clause (and, on the contrary, has expressly refrained from deciding this question)).

For the reasons discussed above, the undersigned finds that the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

Claim Two

*State Court Opinion*

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. The California Court of Appeal denied this claim for the reasons stated herein:

> II. Exclusion of Evidence of Victim's 1992 Welfare Fraud Conviction
>
> Before trial, defense counsel noted his intent to explore evidence of the victim's recent commission of welfare fraud (in support of a theory that she fabricated her account of what had happened as a preemptive strike against defendant reporting her for welfare fraud). Defendant also sought to introduce evidence of the victim's 1992 felony conviction for welfare fraud (in opposition to the prosecutor's motion in limine seeking to exclude this conviction as remote), as demonstrating her appreciation of the potential consequences of welfare fraud and on the issue of the victim's veracity. The court agreed that defendant could fully question the victim about her recent behavior, but found a 1992 conviction to be too stale to have any probative value in the balancing required under Evidence Code section 352. The court adhered to this ruling in a subsequent pretrial discussion, finding the conviction too remote for impeachment and less probative on the question of the victim's awareness of the consequences of welfare fraud than the warnings in her present welfare application. During trial, the court concluded that her testimony claiming blithe indifference to the possibility of a prosecution for welfare fraud was not a basis for admitting the 1992 conviction.

11

> Defendant argues, "[The victim's] motivation to falsely accuse [him] was much greater than she acknowledged. For [this] reason, the prior conviction was highly relevant to her state of mind, regardless of how old it was." He asserts the exclusion was prejudicial.
>
> We will not belabor the issue of whether the 1992 felony conviction had such overwhelming probative value that the trial court abused its discretion in excluding it. We cannot discern a reasonable probability of a more favorable result to defendant had it been admitted. The circumstance of the victim's recent welfare fraud was before the jury. That was sufficient to apprise the jury that the victim's veracity generally was a checkered thing (which was the gist of defense counsel's closing argument). The evidence of the grant of immunity from the prosecution (and the warnings in the victim's welfare applications) were more than sufficient to establish that the victim was indeed aware of the consequences of welfare fraud without introducing the 1992 conviction, and would have allowed defense counsel to pursue the theory in closing argument (which he did not) that the victim fabricated the claim of rape in order to discredit any effort on defendant's part to report it. In any event, this theory of motive to lie on the victim's part was a weak reed on which to lean in the defense case: Whether or not defendant was accused of these crimes, the welfare agency and the district attorney could still have been alerted to the need to investigate potential welfare fraud had defendant chosen to tell them. We reject this argument as a result.

(Respondent's Lodged Document 4 at 10-12.)

*Legal Standard*

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (citations omitted); Chambers v. Mississippi, 410 U.S. 284, 294 (1973); see also Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009) (citing Chambers, 410 U.S. at 294, and Washington v. Texas, 388 U.S. 14, 23 (1967)). However, to evaluate a claim of inability to present a complete defense based on the exclusion of evidence, the court must be mindful that state evidentiary rulings are not cognizable in a federal habeas proceeding unless certain constitutional rights are affected. See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Lincoln v. Sunn, 807 F.2d 805, 816 (9th Cir. 1987) ("Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected.") (citation omitted); see also Rivera v. Illinois, 556 U.S.

1   148, 158–60 (2009) (mere errors in the application of state law are not cognizable on habeas
2   corpus).  When a state court excludes certain evidence, habeas relief is not warranted unless the
3   exclusion is so prejudicial as to jeopardize the petitioner's due process rights.  Tinsley v. Borg,
4   895 F.2d 520, 530 (9th Cir. 1990).  In other words, in order to prevail, petitioner must show that
5   the state court's ruling was so prejudicial that it rendered his trial fundamentally unfair.  See
6   Estelle, 502 U.S. at 68.

7   Moreover, the right to present relevant evidence may, in appropriate circumstances, bow
8   to accommodate other legitimate interests in the criminal trial process.  See Holmes v. South
9   Carolina, 547 U.S. 319, 326–27 (2006) ("While the Constitution [ ] prohibits the exclusion of
10  defense evidence under rules that serve no legitimate purpose or that are disproportionate to the
11  ends they are asserted to promote, well-established rules of evidence permit trial judges to
12  exclude evidence if its probative value is outweighed by certain other factors such as unfair
13  prejudice, confusion of the issues, or potential to mislead the jury.... [T]he Constitution permits
14  judges to exclude evidence that is repetitive ..., only marginally relevant, or poses an undue risk
15  of harassment, prejudice, [or] confusion of the issues.") (internal citations, brackets and quotation
16  marks omitted); United States v. Scheffer, 523 U.S. 303, 308, 315 (1998) (defendant's right to
17  present evidence in his defense "not unlimited" but rather is subject to reasonable evidentiary and
18  procedural restrictions; exclusion pursuant to state evidentiary rule unconstitutional only where it
19  "significantly undermined fundamental elements of the defendant's defense"); Montana v.
20  Egelhoff, 518 U.S. 37, 42 (1996) ("[A]ny number of familiar and unquestionably constitutional
21  evidentiary rules authorize the exclusion of relevant evidence.").

22  *Analysis*

23  For the reasons stated by the California Court of Appeal, the undersigned finds that the
24  exclusion of the victim's approximately eight year old (at the time of trial) conviction for welfare
25  fraud did not violate fundamental fairness.  The prior conviction went to the victim's veracity.
26  Defense counsel was permitted to question the victim regarding her recent behavior of working
27  and failing to report her income.  As noted by the California Court of Appeal, this evidence put
28  the jury on notice regarding issues concerning the victim's veracity.  The evidence that the victim

had been granted immunity from prosecution for the current welfare fraud established that the victim was aware of the consequences of her conduct. The California Court of Appeal reasonably found that evidence of the 1992 conviction was not needed to establish this point. For these reasons, it is not likely that the outcome of the trial would have been different had the jury been aware of the victim's 1992 conviction for welfare fraud.

For the reasons discussed above, the undersigned finds that the exclusion of the victim's prior conviction for welfare fraud did not violate fundamental fairness. The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

<u>Claims Three and Four</u>

*State Court Opinion*

> A. Spousal Rape
>
> Defendant argues, "[The victim] came to [the] motorhome with the apparent intent to spend the night and resume marital relations. Although there was substantial evidence of violent conduct by defendant earlier in the evening, none of that conduct was connected directly to the intercourse." He also points to testimony in which the victim acknowledged having "make-up" sexual relations with defendant after prior arguments where he had hit her, though "not right afterwards" as in the charged incident, and points to her delay in reporting defendant's sexual offense.
>
> This argument utterly ignores the victim's own testimony that she did not intend to spend the night (even in light of her testimony that she had wanted to talk with defendant because she missed him and was interested in returning to him), and that she submitted to the acts of oral copulation and intercourse (even though these disgusted her) only because she feared a refusal would trigger additional violence from defendant. The victim's acknowledgement of previous incidents of "make-up sex" and her delay in reporting the offense simply went to the weight of her testimony that the act of intercourse was not consensual, and not its sufficiency to establish that element. We therefore reject defendant's claim of insufficient evidence for this conviction.
>
> B. Felony False Imprisonment
>
> With respect to this count, defendant argues the victim "promptly left" after he had told her to stay. He contends this demonstrated that his threat to hunt her down and shoot her did not result in any effective menace, and there was an absence of evidence of an appreciable confinement before he left.

> False imprisonment (the elements of which are identical for either the tort or the offense) requires the confinement to be for an appreciable period of time, however short that may be. (<u>Molko v. Holy Spirit Assn.</u>, (1988) 46 Cal.3d 1092, 1123.)
>
> Again, defendant disregards the victim's testimony that she lay where she was as a result of defendant's threat (which made her "[s]uper scared"), and did not attempt to move until the sound of his father's truck disappeared in the distance. Since defendant first had to go to his father's home to ask for the ride before the truck even began to drive away, this is more than sufficient evidence of a brief but appreciable period of confinement resulting from defendant's menace. We thus reject this argument.

(Respondent's Lodged Document 4 at 12-14.)

*Legal Standard*

In reviewing the constitutional sufficiency of evidence to support a criminal conviction, courts follow the two-step process established by <u>Jackson v. Virginia</u>. See <u>United States v. Nevils</u>, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (discussing <u>Jackson v. Virginia</u>, 443 U.S. 307, 318–19 (1979)). First, we "must consider the evidence presented at trial in the light most favorable to the prosecution." <u>Id.</u> at 1164. Second, we must determine whether this evidence, when viewed in that light, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> (citation omitted). Moreover, "when we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)], there is a double dose of deference that can rarely be surmounted," as the state court's "application of the <u>Jackson</u> standard must be 'objectively unreasonable' to warrant habeas relief for a state prisoner." <u>Boyer v. Belleque</u>, 659 F.3d 957, 964–65 (9th Cir. 2011).

*Analysis — Spousal Rape*

Spousal rape is defined, in relevant part, as an act of sexual intercourse with a spouse where it is accomplished against the person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another. Cal. Penal Code § 262(a)(1).

As used in this statute, "duress" means "a direct or implied threat of force, violence, danger or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to

1  perform an act which otherwise would not have been performed, or acquiesce in an act to which
2  one otherwise would not have submitted. Cal. Penal Code § 262(b). As used in this statute,
3  "menace" means "any threat, declaration, or act that shows an intention to inflict an injury upon
4  another." Cal. Penal Code § 262(c).

5  For the reasons stated by the California Court of Appeal, the undersigned finds that, when
6  viewed in the light most favorable to the prosecution, the evidence presented regarding spousal
7  rape was adequate to allow any rational trier of fact to find the elements of that crime beyond a
8  reasonable doubt. Most importantly, the victim testified that she submitted to the acts of oral
9  copulation and intercourse out of fear that her refusal would trigger additional violence from
10 petitioner.

11 Petitioner argues that the victim's failure to mention to authorities the circumstances of
12 the spousal rape until May 31, 2011 (RT at 232), i.e., approximately 15 months after the incident,
13 significantly undermined her credibility regarding the incident. The victim testified that she did
14 not mention the circumstances of the spousal rape initially because she was embarrassed and did
15 not think she would be believed. (Id. at 113.) The victim testified that she told law authorities
16 about the spousal rape after she read in the paper that petitioner was saying that they "had sex all
17 night long." (Id. at 166.)

18 The jury's assessment of the victim's credibility is entitled to near-total deference. Bruce
19 v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional circumstances,
20 Jackson does not permit a federal court to revisit credibility determinations. See id. Accordingly,
21 this court may not review the jury's credibility finding regarding the victim.

22 The finding by the California Court of Appeal that sufficient evidence supported
23 petitioner's conviction for spousal rape was not an unreasonable application of clearly established
24 Supreme Court authority. Accordingly, this claim should be denied.

25 *Analysis — False Imprisonment*

26 California Penal Code § 236 defines false imprisonment as the unlawful violation of the
27 personal liberty of another. California Penal Code § 237 sets the punishment for false
28 imprisonment.

The three elements of felony false imprisonment in California are: (1) a person intentionally and unlawfully restrained, confined, or detained another person, compelling him to stay or go somewhere; (2) that other person did not consent; and (3) the restraint, confinement, or detention was accomplished by violence or menace. Cal. Jury Instructions, Criminal 9.60 (Fall 2006 Revision); see also People v. Fernandez, 26 Cal.App.4th 710 (1994). "Violence" means the use of physical force to restrain beyond the force necessary to effect the restraint; "menace" is the threat of harm express or implied by word or act. See People v. Fernandez, 26 Cal.App.4th at 716.

Petitioner argues that the victim was not restrained because she was not compelled to spend the night. Petitioner also argues that, in the morning, she ran off shortly after he threatened to hunt her down if she left.

Based on the victim's testimony, the jury could reasonably find that the victim did not leave during the night because she was afraid that petitioner would hurt her again. In addition, the victim testified that in the morning petitioner threatened her if she left. The victim testified that after he left, she lay there until she heard the truck go down the hill and then she left. (RT at 119). While the victim did not testify precisely for how long she waited after petitioner left, it would not have been unreasonable for the jury to base the false imprisonment conviction on the events of the morning. A claim for false imprisonment requires that the confinement last "for an appreciable length of time, however short." Fermino v. Fedco, Inc., 7 Cal.4th 701, 715 (1994). While there is no bright line as to what constitutes an appreciable length of time, it appears that the amount of time recognized by a court as a false imprisonment is a matter of minutes. See id. (citing Alterauge v. Los Angeles Turf Club, 97 Cal.App.2d 735 (1950)).

The denial of this claim by the California Court of Appeal as not an unreasonable application of clearly established Supreme Court authority. Therefore, this claim should be denied.

////

////

////

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 27, 2014

Far996.157(2)

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE